**PREMIER INVESTMENTS, Appellant–Cross–Claimant,**

v.

**SUITES OF AMERICA, INC., Appellee-Cross–Claim Defendant.**

No. 49A02–9210–CV–490.

Court of Appeals of Indiana, Second District.

March 15, 1994.

Rehearing Denied April 26, 1994.

---

Bradley W. Skolnik, Robert M. Messick, Freihofer, Minton, Keeler & McClamroch, Indianapolis, for appellant.

Mark R. Wenzel, Richard E. Shevitz, Hopper, Wenzel & Galliher, Indianapolis, for appellee.

SULLIVAN, Judge.

Premier Investments appeals a grant of summary judgment in favor of Suites of America, Inc. (Suites). Upon appeal, Premier asserts the trial court erred in ruling that its mechanic's lien against Suites was invalid. We reverse.

The facts are not in dispute. On February 6, 1989, Premier entered into a comprehensive contract entitled "Hotel Development Agreement" with Howard Johnson Franchise Systems, Inc., the purpose of which was set out in the Preamble of the contract. For the sake of clarity, it should be noted that in the Preamble, reproduced below, Premier is referred to as "Developer" and Howard Johnson as "Owner".

"The purpose of this Agreement is to set forth the terms and conditions for the development of hotels of the style defined as 'Howard Johnson Amerisuites' and other Howard Johnson hotel facilities by Owner and Developer. The Developer will be

responsible for the location of desirable sites; the development of plans, specifications and construction budgets; and the construction, equipping, staffing, and opening of a 'turn-key hotel' ('Hotel Development'). In this Agreement a hotel shall be understood to include all its components such as land, buildings, furniture, fixtures, equipment and other items ('Hotel' or 'Hotels'). The Owner will be responsible for financing a Hotel Development in accordance with this Agreement." Record at 273.

Pursuant to the aforementioned contract, Premier began work on an Amerisuite project located at Keystone at the Crossing in Indianapolis.

In its capacity as developer, Premier hired a general contractor and participated in the hiring of an architect, subcontractors, and other parties necessary for development and construction of the hotel. Premier was also responsible for procuring the real estate upon which the hotel was to be built and supervising construction. Alan Hux, one of three shareholders of Premier, succinctly described Premier's role, relative to Suites, thus:

> "Well, [the hotel project at Keystone at the Crossing] was not ours because we had no money in it, we had no control over it, we couldn't do anything with the property. The only thing that—you know, [Suites of America was] in total control. They'd call up and say do this, I mean, we did that. We had nothing in it.
>
> The only reason we were there was to develop the property, develop the hotel, provide those services necessary to get it from a raw piece of ground to a functioning hotel." Record at 184.

On July 10, 1990, the property was conveyed to Fairfield Development IV, Inc. In August of 1990, the owner informed Premier that the owner was "out of money" and instructed Premier to cease work on the hotel project. Premier instructed the general contractor to "button up" the site, which consisted of such activities as placing plywood over doors and windows.

On September 18, 1990, Fairfield and numerous affiliated entities filed for reorganization in the Southern District of Florida under Chapter 11 of the Bankruptcy Code. The Bankruptcy Court authorized Fairfield's conveyance of the real estate to appellee Suites, subject to liens existing under state law. Prior to Fairfield's conveyance to Suites, Premier filed its Sworn Statement and Notice of Intention to Hold Mechanic's Lien.

On August 5, 1991, Doster Construction, the general contractor, filed a Complaint to Foreclose Mechanic's Lien, naming, among others, both Premier Investments and Suites as party defendants. Premier answered and asserted as a cross-claim against Suites that it (Premier) retained a valid mechanic's lien against the real estate. Suites filed a Motion for Partial Summary Judgment asserting that Premier's mechanic's lien was invalid. On July 13, 1992, the trial court granted Suites's motion, ruling that Premier's mechanic's lien was "invalid, null and void as a matter of law." Record at 386.

The issue presented herein requires an evaluation of how the law applies to undisputed facts. Specifically, we are asked to decide whether the statute in effect at the times in question, I.C. 32–8–3–1 (Burns Code Ed. 1980), authorizes mechanic's liens in favor of parties operating in the role occupied here by Premier, i.e., developer. When the only allegation of error is that the trial court misapplied the law, our task is to correctly apply the law to the undisputed facts. *Lee v. Estate of Cain* (1985) 3d Dist. Ind.App., 476 N.E.2d 922.

The relevant portion of I.C. 32–8–3–1 states:

> **"Persons entitled to liens—Contractors and laborers—No-lien contracts—Notice to owner—Innocent purchasers.**—(That) contractors, subcontractors, mechanics, lessors leasing construction and other equipment and tools, whether or not an operator is also provided by the lessor, journeymen, laborers and all other persons performing labor or furnishing materials or machinery, including the leasing of equipment or tools used, for the erection, altering, repairing or removing any house, mill, manufactory or other building ... may have a lien separately or jointly upon

the house, mill, manufactory or other building ... which they may have erected, altered, repaired, moved or removed or for which they may have furnished materials or machinery of any description, and, on the interest of the owner of the lot or parcel of land on which it stands or with which it is connected to the extent of the value of any labor done, material furnished, or either...." [1]

■ Premier claims that the activities it engaged in as developer of the hotel project constitute "labor" as that term is used in the statute, and that therefore it is entitled to a mechanic's lien.

No Indiana court has considered whether a developer's activities constitute "labor" in this context. In determining whether a party is entitled to a lien under the statute, our approach is well settled:

> "With regard to the first issue concerning strict or liberal construction of Indiana's mechanic's lien statutes in determining whether a certain group may acquire and enforce a mechanic's lien, the law is clear.... In Indiana the mechanic's lien statutes are in derogation of the common law and the provisions of such statutes which relate to the creation, existence or class of individuals entitled to such a lien are to be strictly construed." *Edwards v. Bethlehem Steel Corp.* (1988) 3d Dist. Ind. App., 517 N.E.2d 430, 432.

The type of work one performs determines whether the party may assert a mechanic's lien. The exact nature of the duties performed by Premier in the instant case, as set forth, are not in question. Premier characterizes its work as supervisory in nature and asserts that "supervisory labor has long been permitted by the courts under our mechanic's lien statute." Brief of Appellant at 11. We agree that much of Premier's work as developer included work which might accurately be described as supervisory in nature. The term "supervisory", however, is subject to different interpretations. Many cases discussing this question involve a general contractor whose duties include a combination of physical labor and supervisory responsibili-

ties. Supervisory responsibilities in this context generally consist of oversight of the day-to-day physical construction activities of the project in question.

For example, in *Marcisz v. Osborne* (1954) 124 Ind.App. 574, 118 N.E.2d 378, 380, a husband and wife (owners) entered into a contract with a builder to construct a house. The owners ordered the builder to cease working upon the house prior to its completion. The builders claimed that the owners had not paid the entire amount due for work completed at the time construction ceased and filed suit, seeking to foreclose their mechanic's lien for the amount that they claimed remained unpaid. The builders prevailed at trial and the owners appealed, in part upon grounds that a portion of the damage award represented fees for supervisory labor and that such was not recoverable under the mechanic's lien law. The appellate court rejected this argument, stating:

> "It is generally held that enforcement of a claim for supervisory labor in the construction of property is permitted under mechanic's lien statutes in most jurisdictions ... and Indiana follows the majority rule in this regard. [Citation omitted.] The reasoning of the court in the foregoing case is that 'one who labors with body or mind, or both, is a laborer' and held that an architect who drew plans and specifications and did supervision of the construction was a laborer under the lien statute." *Marcisz, supra,* 118 N.E.2d at 380.

Although at first glance the above language seems to support Premier's contention in this regard, it must be remembered that the builder provided physical labor, which is clearly lienable under the statute, in addition to supervisory labor. Viewed in that light, the above may mean nothing more than that a general contractor, a party explicitly named in the statute as entitled to a lien, may file a mechanic's lien for all types of work it performs, including supervisory labor. This does not necessarily address the question of whether one may hold a mechanic's lien for performing *only* supervisory labor, especially when that party's functional

1. The relevant provision was not affected by the amendment of 1993. (See 1993 Supp.)

capacity, i.e., developer, is not named in the statute.

The two views upon this question have been thoroughly explored and discussed in other jurisdictions. According to one view, the sort of labor done by a developer, i.e., supervisory labor, while not physical labor in the common sense of the word, is nevertheless labor within the meaning of a mechanic's lien statute. According to the other view, the term "labor" connotes physical labor and a broader judicial construction of that term, resulting in increasing the class entitled to mechanic's liens, would effect an impermissible judicial rewriting of the statute.

■ A mechanic's lien statute is a legislatively created device the primary purpose of which is to protect those who furnish materials or services for the improvement of another's property. *London Construction Company v. Roseville Townhomes, Inc.* (1991) Minn.App., 473 N.W.2d 917, 919. However, mechanic's lien statutes exist in derogation of the common law, and courts have sometimes been reluctant to extend the statute's benefits to persons whose services are not contemplated in the particular statute, upon grounds that such extension lies solely within the province of the legislature. For example, in *Wilkinson v. Rowe* (1957) 266 Ala. 675, 98 So.2d 435, the court refused to allow a lien for a surveyor's services, stating:

> " 'Of itself, [a mechanic's lien] is a peculiar, particular, special remedy given by statute, founded and circumscribed by the terms of its creation, and the courts are powerless to take it up where the statute may leave it, and extend it to meet facts and circumstances, which they may believe present a case of equal merit, or a necessity of the same kind, as the cases or necessities for which the statute provides.' " 98 So.2d at 439.

Similarly, in *London Construction Company, supra,* the Minnesota appellate court refused to allow an attorney to file a mechanic's lien for legal services rendered. Once again, the court expressed its reluctance to extend the list of services which under the relevant Minnesota statute would be classified as "labor", concluding that extension of the statute's protection "should be a legislative deci-

sion, not a judicial one." 473 N.W.2d at 920. These decisions reflect a restrictive approach in construing the statute.

In evidencing a reluctance to assume what is perceived to be a legislative function most courts also refuse to recognize mechanic's lien entitlements by concluding that services performed by the party in question are not those contemplated by the relevant mechanic's lien statute. Such an interpretation is consistent with a narrow interpretation of the terms "labor" and "laborer". This narrow interpretation is exemplified in *Stephens v. Hicks* (1911) 156 N.C. 239, 72 S.E. 313. In *Stephens,* the court concluded that one who performs the work of supervisor was not entitled to a mechanic's lien for such services. This conclusion was based upon the court's definitions of the terms "labor" and "laborer":

> "This court in deciding [another] case, adopted the definition of the English courts in construing their statute that a laborer or mechanic is 'a servant employed in some manual occupation.' It is further said that ... the word 'labor,' in legal parlance, has a well-defined, understood, and accepted meaning. It implies continued exertion of the more onerous and inferior kind, usually and chiefly consisting in the protracted exertion of muscular force. Labor may be business, but it is not necessarily so, and business is not always labor. 'In legal significance, labor implies toil; exertion producing weariness; manual exertion of a toilsome nature'." 72 S.E. at 314–15.

Some cases have looked to the literal language of the statute and have focused upon the title or classification of the claimant as being within or without those specifically named. *See Atkinson v. Tiscione* (1991) 150 Misc.2d 971, 571 N.Y.S.2d 189.

In summary, it appears that courts which have denied entitlements to mechanic's liens have done so upon the basis that the relevant statute either did not explicitly include the seeking party within the class of those who are entitled to mechanic's liens, or upon the basis that the services provided by the seeking party were not "labor" within the mean-

ing of the statute. *See also Stephens, supra,* 72 S.E. at 315 ("[an architect] uses his brain far more than he does his brawn—his trained mental faculties, rather than his physical or muscular powers—and herein, to a large extent, is to be found the distinction between men employed in his kind and the laborer, who works mechanically, though under his direction.")

In contrast, other courts have held that some groups not explicitly mentioned in their state's statute are nevertheless entitled to liens. This generally results from interpreting the terms "labor" and "laborer" expansively enough to include within the statute's ambit the particular services performed by the seeking party. Such interpretation is exemplified in *Stern v. Great Plains Federal Savings and Loan Association* (1989) Okla. App., 778 P.2d 933.

In *Stern,* the court was called upon to decide whether an architect's services were lienable under Oklahoma's mechanic's lien statute. The Oklahoma statute did not explicitly name architects as among those entitled to a lien, nor was its use of the term "labor" different from the usage employed in the current Indiana statute.[2] The court concluded that the services provided by architects were labor within the meaning of the statute:

> "The nature of the work done by an architect, e.g., plans and specifications which are drawn prior to the first work done on the land, is work which is not seen on the land itself. However, it leads to the work which is done on the land. These services are necessary before the actual physical construction upon the land can take place, and without which such construction would not occur. We hold that the services of an architect in the preparation of plans and specifications which are used in the work done on the land are improvements of land and are thus lienable claims...." 778 P.2d at 935.

Thus, courts which construe a lien statute's scope to include services such as those provided by architects make no distinction between labor of the body and labor of the mind.

Turning to the instant case, it is clear that I.C. 32–8–3–1 does not explicitly name developers as one of the groups entitled to a mechanic's lien. We conclude, however, that prior Indiana decisions reflect that our courts have construed the term "labor" expansively so as to include the type of services provided by a developer.

In *Marcisz, supra,* 118 N.E.2d 378, among the services provided were supervisory services. The court held that such services were within the purview of Indiana's statute. Although *Marcisz* was decided forty years ago, we find no trend in the intervening years away from a broad construction of the term "labor" in the lien statute. Indeed, we find few recent cases discussing the question at all. Accordingly, it appears that it remains the law of Indiana that one who renders supervisory services is entitled to a mechanic's lien under the lien statute.

In the instant case, the parties stipulated that Premier's duties as developer included locating the site, developing plans, specifications, and budgets, and supervising construction, as well as equipping, staffing and opening the hotel. It is obvious that such not only includes the supervisory duties which Indiana courts have held are lienable under the statute, but also includes other duties which would constitute "labor" as that term has been construed. For example, our statute has been construed to include architects' services as lienable. In *Beeson v. Overpeck* (1942) 112 Ind.App. 195, 44 N.E.2d 195, the court held that an architect's services are lienable because the services performed by an architect constitute "labor".

> " 'The language of our statute is general in its terms, and, in our opinion, embraces all persons who perform 'any labor.' We are

---

**2.** The relevant portion of the statute reads as follows:

"Any person who shall, under oral or written contract with the owner of any tract or piece of land, perform labor, furnish material or lease or rent equipment used on said land for the

erection, alteration or repair of any building ... shall have a lien upon the whole of said tract or piece of land, the buildings and appurtenances." Okla.Stat.Ann. tit. 42, § 141 (West 1989).

unable to draw the distinction between one who puts his labor into plans for the erection of a building and actually supervises its erection and one who in the role of a bricklayer or carpenter actually performs a manual service [citation omitted].... The architect who superintends the construction of a building performs labor as truly as the carpenter who frames it, or the mason who lays the walls, and labor of a most important character. It is not any the less labor within the general meaning of the word, that it is done by a person who is fitted by special training and skill for its performance. The language quoted makes no distinction between skilled and unskilled labor, or between mere manual labor and the labor of one who supervises, directs, and applies the labor of others. [citation omitted]' " 44 N.E.2d at 197.

We perceive no meaningful distinction between many of the services performed by Premier and the services performed by the architect as described above. Indeed, the above-quoted passage might just as easily have been written about developers as architects. In short, although a developer may be a label affixed relatively recently to a party performing particular functions in the development of real estate, the functions themselves are of the same sort which have historically been performed by contractors, subcontractors, and architects. The services performed by the latter groups have long been considered lienable under our statute, and the same result should obtain regardless of the label attached to the party. We conclude that the services performed by Premier as described in its contract with Suites are lienable under I.C. 32–8–3–1.

■ Suites contends that, even if Premier's services were lienable under the statute, Premier is estopped from filing a lien by virtue of a clause contained in its contract with Suites. Pursuant to the written agreement, Premier was responsible for procuring construction contracts with contractors, among others. In this regard, the contract provided that:

"*To the extent permitted by law each construction contract will contain a provision prohibiting contractors from filing any notice of intention, mechanics' lien or similar filing against the Hotel.* [Premier] will have such filings discharged as soon as practical and will make no payments to any Contractor maintaining such filing. Each Request for Payment shall include conditional mechanics' lien release(s) from each Contractor certifying as follows or in a similar form stipulated by [Suites]: 'There are no known mechanics' or materialmen liens outstanding at the date of this requisition, that all due and payable bills with respect to the project have been paid to date or are included in the amount requested in the undersigned's current invoice, and that, except for the amounts included in such current invoice, there is no known basis for the filing of any mechanics' or materialmen liens on the project, and that upon receipt of payment pursuant to such current invoice, the undersigned irrevocably waives and relinquishes any mechanic's lien claim that may otherwise arise for the benefit of the undersigned for all work completed through the date of such current invoice.' " [Emphasis supplied] Record at 93–94.

Suites claims that this provision requires Premier to resist the filing of mechanic's liens against the subject real estate, including the filing of Premier's own mechanic's lien.

We disagree that the aforementioned contractual provision requires that Premier forego the filing of a lien. The clause in question pertains only to contracts between Premier and third party contractors, and amounts to little more than a directive that Premier not enter into written agreements with contractors which permit the *contractors* to file mechanic's liens. It does not address Premier's right to do so, and we are not free to read such a provision into the contract where one does not exist.

■ We therefore consider the principle argument advanced by Suites—estoppel. Estoppel, as Suites seeks to apply it in the instant case, is an equitable concept which operates to prohibit a party from adopting inconsistent positions and thereby gain unfair advantage or profit unjustly. Typically, our courts have resolved claims of estoppel

through application of a five-step test. Under that approach, the party seeking to establish estoppel has the burden to prove 1) a misrepresentation or concealment of material facts 2) made with knowledge of the facts 3) to a party ignorant of the matter 4) with the intent that the other party act upon it; and 5) the other party must act upon it. *See Hammes v. Frank* (1991) 1st Dist. Ind.App., 579 N.E.2d 1348, *trans. dismissed.* However, estoppel is a concept grounded in fairness, and a claim of estoppel may properly be considered whenever a party is alleged to have actively participated in the creation of a misperception of fact or mistaken belief of which it then seeks to take unfair advantage. In some situations, as in the instant case, the context in which the claim is made does not lend itself to tidy application of the component steps of the test. In such cases, courts may nevertheless consider whether the doctrine applies by examining the actions of the party against whom the claim is made and determining whether fairness compels a holding of estoppel. *Cf. First National Bank of Logansport v. Logan Manufacturing Company, Inc.* (1991) Ind., 577 N.E.2d 949. "Adopting a position" as used with respect to Premier's contentions, may constitute either word or deed, or both, and may include silence or inaction. *See Sheraton Corporation of America v. Kingsford Packing Company, Inc.* (1974) 162 Ind.App. 470, 319 N.E.2d 852.

■ In the instant case, Suites claims, in effect, that Premier adopted inconsistent positions in agreeing to utilize no-lien contracts with third party contractors, while later seeking to employ a lien on its own behalf. We disagree that the two positions are inconsistent. Premier's agreement with regard to no-lien contracts pertained only to contracts between itself and third party contractors which might impose liability upon the owner, Suites. It did not purport to apply to the agreement between itself and Suites. Had the agreement between Premier and Suites specified, for instance, that *any* contract concerning the construction of the hotel contain a no-lien clause, then Premier would be estopped from filing a lien. Such, however, is not the case. There being no inconsistency between agreeing to enter into no-lien contracts with third party contractors on the one hand, and filing a lien on its own behalf on the other, we conclude that estoppel is inappropriate in the instant case.

The judgment of the trial court is reversed and this cause is remanded with instructions to reinstate Premier's Cross–Claim to Foreclose Mechanic's Lien.

SHARPNACK, C.J., and BARTEAU, J., concur.